



_____

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| IN RE: | |
|---|---|
| MICHAEL D. JOHNSON,<br>SHONDA J. ZOLLINGER-JOHNSON | Case No. 15-10191<br>Chapter 13 |
| Debtors. | |

## ORDER DENYING STAY RELIEF

When a chapter 13 plan is confirmed, its terms bind the debtor and every creditor.[1] The binding effect of the plan does not relieve the debtor of the need to adequately protect the interests of his secured creditors and if it appears that adequate protection of the creditor's interest has failed as a result of post-confirmation developments, the Court can grant relief from the automatic stay for

---

[1] 11 U.S.C. § 1327(a).

1

cause.² The party seeking that relief has the burden of proof on issues relating to the debtor's equity in the property; the debtor has the burden on all other issues.³ In this case, the Valley State Bank did not prove either that the debtors have violated the plan's terms or that they have committed post-confirmation conduct that would trigger stay relief.⁴

*Facts*

Valley State Bank loaned Michael and Shonda Johnson $71,000 in 2010 to refinance and improve their home in Belle Plaine, Sumner County, Kansas.⁵ The debtors gave the bank a note in that amount dated August 20, 2010. The note is secured by a mortgage on their homestead, among other things, and called for 98 monthly payments of $913.12, with the final payment being due on August 15, 2018. The homestead consists of a manufactured home that is set on 3.6 acres in rural Belle Plaine.⁶ The land lies in the 100-year flood plain and has been flooded twice in the last 35 years, the last time in 1998. Mr. Johnson testified that the couple bought the house as a "fixer-upper," lived in and worked on the house from 1998 to 2005, and thereafter leased it to another party.⁷ When they regained possession in 2010, they

---

² 11 U.S.C. § 362(d)(1).
³ 11 U.S.C. § 362(g)(1).
⁴ The Court conducted an evidentiary hearing on Valley State Bank's motion for relief from the stay, Dkt. 54. Debtors appeared by their attorney David J. Lund. The Valley State Bank appeared by its counsel W. Thomas Gilman.
⁵ *See* Claim no. 7-3, pp. 23-30 (Ex. 3, Note and Mortgage).
⁶ The manufactured home was built in 1972, making it 38 years old at the time of the 2010 loan transaction. *See* Ex. 6, pp. 2, 3, 11.
⁷ Mr. Johnson described it as a "Tenant Rent to Own" sale on contract for the price of $60,000.

2

found the house in disrepair and borrowed from the Bank to renovate it. At least one of them has lived there since and Mr. Johnson stated that he lives there today. Mrs. Johnson lives in Belleville, Kansas, but spends time in the Belle Plaine residence on weekends.

When the Bank made this loan in 2010, it obtained an appraisal from Munson Appraisers that valued the property, subject to certain improvements being completed, at $98,000.[8] The proposed improvements included electrical work, plumbing, replacing the HVAC units, re-roofing the garage and family room (a converted porch), cabinet bases, a bathroom remodel, carpet and vinyl, replacing two doors, replacing all of the windows, adding vinyl siding, touching up the exterior paint, and replacing certain interior trim work. In the 2010 appraisal, Scott Munson used six comparable sales, including 934 N. Timber Road, a property that had sold for $92,200 in Belle Plaine. His comparable sales prices ranged from $75,000 to $127,000.

The Johnsons defaulted repeatedly on the mortgage loan and, in 2015, the Bank foreclosed. That prompted the Johnsons to file this chapter 13 case on February 5, 2015. Because they believed they had substantial equity in the house, their amended plan proposed to pay the Bank nothing until it sold, when the Bank would be paid in full.[9] Meanwhile, the debtors would make monthly payments through the plan on the Bank's two small notes that are secured by this mortgage as well as

---

[8] Ex. 6.
[9] Ex. 2, pp. 4-6 (Dkt. 33).

3

security interests in a Chevrolet Tahoe and a Fifth Wheel trailer. Those payments are current. The Bank twice amended its proof of claim in this case.[10] As of the petition date, the Bank's mortgage claim, with accrued interest and other charges, amounted to $49,905.48.[11] That amount increases at the rate of 5.459% per annum or $7.4639 per diem. After negotiations, the Bank and the debtors agreed to an order setting out revised plan terms and agreeing to confirmation of the plan (the "Agreed Order") that was filed on July 10, 2015.[12] The amended plan was confirmed on July 13, 2015.[13]

The Agreed Order provides that the debtors can retain the home and conditions the continuation of the automatic stay upon the following terms:

1. One or both debtors will occupy the home while it is being marketed;

2. The debtors will give notice to the Bank of any proposed sale;

3. The debtors will keep the home insured and the ad valorem taxes paid current at all times; and

4. The debtors will maintain an equity cushion in the home as described in the following paragraph—

> 4. It is agreed that the current outstanding loan value to market value ratio in the Real Estate is approximately 67% (the Bank's outstanding loan amount secured by the Real Estate ($49,563.68) divided by $74,000, the debtors' claimed value of the Real Estate). In the event the Bank's outstanding claim continues to accrue interest, late fees and attorney's fees and expenses to the point that *the Bank's outstanding loan balance is 80% or more ($59,200 or more) of the market value ($74,000),* the

---

[10] *See* Claims 7-1, 7-2, and 7-3.
[11] *See* Claim 7-3, p. 3 (Ex. 3, p.3).
[12] Ex. 4 (Dkt. 43).
[13] Dkt. 45.

4

debtors shall either (a) make adequate protection payments to the Bank in the amount of the ongoing monthly payment ($912.13) or (b) absent such payments, the Bank shall be granted relief from stay to recommence the foreclosure action (in rem only) pending in the Sumner County, Kansas, District Court.[14]

Ms. Wharton, the Bank's loan officer, testified that she was comfortable agreeing to these terms because she had a $98,000 appraisal on file and because the Johnsons had scheduled the property at $74,000. She assumed that all of the anticipated repairs had been completed.

The property has been listed for sale at all relevant times. The debtors' listing agent, Julie Gooch, stated that she initially listed the home in September of 2014 at $78,000 and that the price has been dropped several times, most recently to $69,900 in December of 2015. While the house shows somewhat frequently, 20 times in the 45 days between November 15, 2015 and year's end, Ms. Gooch suggested that its location in the flood plain and history of being flooded detracts from its salability.[15] She agreed that while there are repairs needed, the house is in reasonable condition and is the same condition it was in July of 2015 when the Agreed Order was negotiated and entered.

Sometime after the Agreed Order was entered, Ms. Wharton drove past the property, noted the lack of yard maintenance, and concluded that the house was unoccupied. She then contacted the Bank's counsel to arrange an inspection and appraisal. Mr. Munson visited the property in December of 2015 where he met Mr.

---

[14] Dkt. 43. Emphasis added.
[15] Ex. 8.

5

Johnson and made an appraisal, concluding that the value of the home had declined to $45,000.[16] Based on that appraisal, the Bank filed this motion for relief from the stay on the basis that the mortgage loan balance, now exceeds the much-diminished value of the property in violation of the Agreed Order.

Mr. Munson said that when he made the 2015 appraisal, he did not know the Johnsons had filed bankruptcy, only learning that from Ms. Wharton when he submitted the report. He also said he didn't refer to the 2010 appraisal before visiting the Johnson home in December 2015. The 2015 report concludes that the property is only in fair condition. Mr. Munson noted that it could not be easily compared to the 2010 appraisal because not all of the improvements on which the former report was based had been completed. Remaining incomplete were the siding, some of the roofing, the paint touch-up, and the interior trim work. This time, he only pulled three comparable sales that ranged between $34,900 and $65,000. Notably, one of his comparables was the sale of 934 N. Timber, formerly included in the 2010 appraisal and a house with which Ms. Gooch was familiar. While Timber sold for $92,000 before the 2010 report, by the time of the 2015 appraisal, it had recently sold again, this time for $34,500. Ms. Gooch noted that she had shown the home, that it was a "repo," and that it had been "stripped" of appliances, HVAC units, glass, and even doorknobs. While Mr. Munson didn't agree that the home had been "stripped," he conceded that it was in particularly poor condition. The 2015 comparables are much lower quality and value houses than those he used in 2010. In testimony, Mr. Munson said that the

---

[16] Ex. 7.

**6**

debtor's house that he appraised in 2010 by assuming that several improvements would be made, never actually "existed" because not all of the improvements were made, thus justifying the significant drop in his value conclusion.

Mr. Johnson testified that he would take $69,000 for the house as of the hearing date, February 16, 2016. He thought $74,000 was fair when he scheduled that amount and he believes the house is worth much more than the $45,000 value Munson gave it. He also pointed out that he has completed everything on the 2010 list except re-roofing the garage and family room, the siding, and the painting. He has replaced some, but not all, of the windows, stopping because he ran out of money. He indicated that he wants to sell the house and pay off the Bank's claim.

*Analysis*

Deciding this stay relief motion comes down to interpreting the Agreed Order's provisions and determining whether the Bank demonstrated that the debtors have failed to adequately protect its position in a way that would warrant lifting the stay. The Bank argues that the house's value has dropped and that, as a consequence, the Bank no longer has the 80% loan-to-value ratio the Agreed Order required, triggering stay relief to continue with its foreclosure action. The debtors reply that the Agreed Order merely provides that the loan balance remain under $59,200, not that the loan balance must be maintained at an amount lower than 80% of the home's current value.

I agree with the debtors' reading of paragraph 4. That sentence provides that if the Bank's "outstanding loan balance is 80% or more ($59,200 or more) of the

7

market value ($74,000)," the debtors must either make adequate protection payments or suffer the loss of the stay. It does not refer to either the "market value" or the "outstanding loan balance" being adjusted. Instead, it refers to the then-current market value as the basis for calculating what the maximum loan amount can be before adequate protection is required. It expressly contemplates that the loan balance will increase (as it must to recognize accruing interest). Ms. Wharton stated that she worked on the wording of the Agreed Order with her counsel and that the Bank had agreed that, so long as the loan balance remained below $59,200, the debtors would have no current monthly payment obligations.

The debtors are not in default of their obligations under the Agreed Order. As of the date of the hearing, the loan balance was $52,710.44, including accrued interest to February 16, 2016 at 5.459% per annum or $7.4639 per diem, late fees, attorney fees, filing fees, and abstract costs.[17] This leaves the debtors with a cushion under the Agreed Order of about $6,490.[18] The Bank abandoned its allegation that the debtors had failed to occupy the property. Because the Agreed Order is part of the confirmed plan, the debtors and the Bank are bound by its terms. Section 1327(a) makes that plain.

That said, to retain the stay's protection, the debtors must still adequately protect the Bank's interests. But that obligation does not extend to protecting the

---

[17] The Bank's claim on the date of the petition was $49,905.48. Interest accrued at the rate of 5.459% or $7.4639 per diem from Feb 6, 2015 – Feb 16, 2016 (376 days) for a total of $2,804.96. $49,905.48 + $2,804.96 = $52,710.44.

[18] Maximum outstanding loan balance under the Agreed Order of $59,200 minus outstanding loan balance on the date of hearing of $52,710.44 equals $6,489.56.

8

Bank from fluctuating market values. The debtors did not guarantee that the value of their home would be sufficient to provide the Bank 80% loan-to-value. Ms. Wharton stated that she did not view the property until after confirmation. When she did, she concluded that it was either unoccupied or wasn't being effectively maintained and only then did the Bank seek an inspection and appraisal.

In general, post-confirmation stay relief is only a remedy for post-confirmation problems:

> . . . a postconfirmation request for relief from the stay must be based on postconfirmation facts, events, or defaults: confirmation is an adjudication of the rights of all parties, and a creditor cannot use a postconfirmation request for relief from the stay as a collateral attack on the confirmation order.[19]

The binding effect of confirmation that is imposed by § 1327(a) drives this conclusion. Confirmation precludes arguments that a creditor might have made prepetition, even those related to a prepetition lack of adequate protection.[20] Here, the Agreed Order

---

[19] Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4th Edition, § 242.1, at ¶ 1, Sec. Rev. June 30, 2004, www.Ch13online.com. *See also* Lomas Mortgage USA v. Wiese (In re Wiese), 980 F.2d 1279, 1284 (9th Cir. 1992) (bankruptcy court did not err by denying stay relief where issues involved were determined in the confirmation of the Chapter 13 plan and were *res judicata* ), *rev'd on other grounds* 508 U.S. 958 (1993) (judgment vacated and case remanded in light of *Nobelman v. American Savings Bank,* 508 U.S. 324 (1993)); *In re Pence,* 905 F.2d 1107, 1110 (7th Cir. 1990) (post-confirmation stay relief denied where creditor did not object to confirmation nor object to valuation of the property at confirmation; mortgagee could not collaterally attack confirmation order to challenge valuation of property in chapter 13 plan); *Anaheim Savings and Loan Assoc. v. Evans (In re Evans)*, 30 B.R. 530 (9th Cir. BAP 1983) (confirmed chapter 13 plan barred secured creditors from seeking stay relief absent postconfirmation default in carrying out plan).

[20] *See e.g. Chevy Chase Bank v. Locke (In re Locke)*, 227 B.R. 68 (Bankr. E.D. Va. 1998) (Failure to object to confirmation precludes post-confirmation stay relief based on contention that plan does not adequately protect creditor's interest in

resolved the Bank's objection to confirmation and memorialized the parties' agreed plan treatment of the Bank's claim, including when adequate protection payments would be required.[21]

The Bank relies on an alleged diminution of the value of its collateral to support its argument that it is no longer adequately protected because the debtor's equity cushion has been depleted. The Bank's appraiser attributed some of that value drop to the fact that the Johnsons did not complete all of the improvements that underlay the 2010 appraisal. The Bank concedes that it did not inspect or appraise the house before entering into the Agreed Order. Ms. Wharton testified that she accepted the Agreed Order's $74,000 because she assumed the repairs had been made. The Bank didn't prove any post-confirmation conduct or omission of the debtors that could have contributed to the value drop. To the extent it relies on any potential pre-petition dispute that could have arisen from the debtor's failure to complete the improvements, that dispute was resolved when the Agreed Order was entered and the plan confirmed. Section 1327(a) rules out any collateral attack on that resolution.

---

vehicle); *In re Mitchell,* 281 B.R. 90, 94 (Bankr. S.D. Ala. 2001) (Absent a default in carrying out the plan, confirmed plan precludes relief from the stay on grounds of lack of adequate protection); *Lester Mobile Home Sales, Inc. v. Woods (In re Woods),* 130 B.R. 204 (W.D. Va. 1990) (confirmation precludes stay relief on ground that the plan improperly valued creditor's collateral).

[21] *Cf. In re Taumoepeau,* 523 F.3d 1213, 1218-19 (10th Cir. 2008) (preconfirmation stipulation between lender and debtor survived confirmation order where amended plan addressed only prepetition arrearage while stipulation addressed postpetition arrearage and the postpetition arrearage was paid outside the plan).

**10**

Nor did the Bank carry its burden to prove a lack of equity. The movant bears that burden under § 362(g). Munson's opinion that the house is only worth $45,000 isn't enough. That report purports to value the same house portrayed in the 2010 appraisal, but with most of the improvements upon which the first appraisal was predicated having been done. The 2010 appraisal drew from significantly higher comparative sales than did the second appraisal. Mr. Munson's reliance on the Timber comparable in the 2015 report is particularly troubling. While one can quibble about what "stripped" means, Ms. Gooch convinced me that the Timber property was not habitable: it lacked sinks, HVAC units, mirrors, windows, wiring, and even doorknobs. By comparison, Mr. Johnson lives in the subject property and the pictures show that it is in habitable condition. It is difficult to believe that the presence of a $34,500 sale in the comparative sales analysis did not significantly drive Mr. Munson's value conclusion below what reflects market reality. In short, the 2015 appraisal didn't persuade me.

The house's listing price has now dropped to $69,900. As of the hearing date, it hadn't yet been sold. The house may not be worth $74,000. But even if, as Mr. Johnson believes, the house is only worth $69,000, 80% of that amount is $55,200 which still leaves the debtors and the Bank a modest cushion.[22] At some point in the future, if the Johnsons fail to sell or resume payments, they will have no equity in the house, but that time has not arrived.

---

[22] The equity cushion would be $2,490 ($55,200 - $52,710.44 = $2,489.56). That cushion will evaporate within the next year as post-petition interest accrues on the Bank's claim in the amount of $2,724 each year (365 x $7.4639 per diem interest).

**11**

The Bank's motion for stay relief is therefore DENIED.

###